NOT DESIGNATED FOR PUBLICATION

No. 118,649

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JERRY L. VICKERS, et al.,
*Appellants*,

v.

FRANKLIN COUNTY BOARD OF COMMISSIONERS,
MID-STATES MATERIALS, LLC, and ROBERT B. KILLOUGH,
*Appellees*.

MEMORANDUM OPINION

Appeal from Franklin District Court; ERIC W. GODDERZ, judge. Opinion filed July 19, 2019. Reversed and remanded with directions.

*R. Scott Ryburn*, of Anderson & Byrd, LLP, of Ottawa, for appellants.

*Blaine Finch*, of Finch, Covington & Boyd, Chartered, of Ottawa, *Bradley R. Finkeldei*, of Stevens & Brand, LLP, of Lawrence, and *Derek L. Brown*, county counselor, for appellees.

Before BRUNS, P.J., BUSER and SCHROEDER, JJ.

BUSER, J.: Jerry L. Vickers, et al. (collectively Plaintiffs) are landowners who own real estate near a rock quarry in Franklin County, Kansas. The rock quarry is owned by Robert B. Killough and leased to Mid-States Materials, LLC (Mid-States). Plaintiffs filed a lawsuit against the Franklin County Board of County Commissioners (Board), Mid-States, and Killough (collectively Defendants), seeking to set aside a special use permit granted in 1998 and to enjoin Mid-States from operating the rock quarry. The district court granted the Defendants' motion for summary judgment and upheld the

1

validity of the special use permit. The Plaintiffs' motion for summary judgment was denied.

Plaintiffs appeal the district court's order granting summary judgment to the Defendants. On appeal, the Plaintiffs raise several arguments challenging the validity of the special use permit which allows for quarry operations. Plaintiffs contend: (1) Franklin County failed to follow the required procedures when issuing the 1998 special use permit; (2) the rock quarry was not operating as a legal nonconforming use when the special use permit was issued or thereafter; (3) Franklin County failed to address the factors identified in *Golden v. City of Overland Park*, 224 Kan. 591, 584 P.2d 130 (1978), when granting the special use permit; and (4) the special use permit lapsed because rock sales did not occur every 365 days.

After reviewing the record on appeal and the parties' briefs, we find the Plaintiffs' argument—that the special use permit is invalid—has merit because Franklin County failed to comply with Kansas statutory requirements when issuing it. Accordingly, we reverse the district court's grant of summary judgment for Defendants which upheld the validity of the Quarry's special use permit. The case is remanded to the district court with directions to grant summary judgment for Plaintiffs on their claim that the Quarry's special use permit is invalid and to vacate the permit. On the other hand, on remand the district court is directed to grant summary judgment for Defendants on their claim that the Quarry was in operation prior to and at the time of the adoption of the zoning regulations and the Quarry's lawful nonconforming use has not been discontinued or abandoned since that time.

FACTUAL AND PROCEDURAL BACKGROUND

Mid-States operates a rock quarry in the Peoria Township of Franklin County, Kansas, on three adjoining tracts of land owned by Killough. The three tracts of land are

2

collectively known as the Hickory Hills Quarry (the Quarry). Before Killough leased the Quarry to Mid-States in 2013, there were other operators.

The Quarry began operation in 1994 and was originally comprised of two tracts of land. By January 1995, the Quarry had a large pit and rock stockpile. On June 1, 1995, Killough leased the Quarry to Killough Quarries, Inc.—a corporation he owned and operated. About three months later, Killough Quarries, Inc. assigned the quarry lease to Hunt Midwest Mining, Inc. (Hunt Midwest). In 1996, Killough purchased the third tract of land which now included the Quarry. Killough and Hunt Midwest amended the assigned quarry lease in July 1997 to include the third tract of land. As of July 22, 1997, all three tracts of land that comprised the Quarry were leased to Hunt Midwest in a single lease.

On January 8, 1998, the Board included the Peoria Township within Franklin County's zoning regulations by adopting Resolution 98-01. Under this resolution, all the unincorporated area of the Peoria Township was zoned as an Agricultural District (A-3).

To address existing businesses operating on previously unzoned property in Franklin County, the Board proposed Resolution 98-13. Resolution 98-13 passed on March 9, 1998, and added Section 116 to Article 4 of Franklin County's zoning regulations. Under Section 4-116, property owners had 180 days from the effective date of the amendment to apply for a special use permit at no charge. The procedure to obtain a special use permit under Section 4-116 is described later in this opinion.

In June 1998, Killough and Hunt Midwest applied for a special use permit for rock quarrying and mining, rock crushing, rock stockpiling, and rock sales on the Quarry. Franklin County did not provide the Quarry's surrounding neighbors with notice of the special use permit application. A special use permit was approved for the Quarry on July 10, 1998.

3

Killough leased the Quarry to Mid-States in 2013. About three years later, in June 2016, Mid-States began blasting rock at the Quarry. This was the first time since 1994 that rock was blasted or mined from the Quarry. On September 26, 2016, Plaintiffs filed this action and petitioned the district court for an order declaring the Quarry's special use permit invalid and also seeking to enjoin the Defendants from all quarry operations.

Both parties moved for summary judgment. Defendants argued that summary judgment should be granted in their favor because: (1) the Quarry's special use permit was valid, and (2) even if the special use permit was invalid, the Quarry was operating as a legal nonconforming use. Plaintiffs responded that summary judgment should be granted in their favor because the Quarry's special use permit was not valid. Plaintiffs also claimed the Quarry may not operate as a nonconforming use because no quarry operations occurred for more than six months before Franklin County issued the special use permit or thereafter.

The district court granted Defendants' motion for summary judgment based on its determination that the Quarry's special use permit was validly issued by Franklin County.

Plaintiffs appeal.

THE VALIDITY OF THE QUARRY'S SPECIAL USE PERMIT

On appeal, the Plaintiffs contend the Quarry's special use permit is invalid because Franklin County violated the procedural requirements of K.S.A. 12-757 and Franklin County's 1998 zoning regulations (1998 Zoning Regulations) when approving the special use permit. Plaintiffs also assert: (1) the special use permit was invalid because Franklin County failed to consider the so-called *Golden* factors, *Golden*, 224 Kan. at 598-99; (2) Defendants failed to prove the Quarry's special use permit had not lapsed; and (3) the Quarry was not operating as a legal nonconforming use.

4

We begin the analysis with our standard of review. Our court's standard for reviewing a district court's summary judgment ruling is well established:

> ""Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and when we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied."' [Citation omitted.]" *Patterson v. Cowley County, Kansas*, 307 Kan. 616, 621, 413 P.3d 432 (2018).

As discussed throughout this opinion, the district court made numerous findings of fact that were set forth in separately numbered paragraphs in its journal entry filed on November 22, 2017. The parties do not argue that there is any genuine issue as to any material fact found by the district court. Rather, as they did in the district court, the parties strongly dispute the district court's legal conclusions based on those material facts.

Without any factual dispute, our review of a summary judgment order is de novo. *Martin v. Naik*, 297 Kan. 241, 246, 300 P.3d 625 (2013). The interpretation of statutes and ordinances also presents questions of law subject to de novo review. *State ex rel. Schmidt v. City of Wichita*, 303 Kan. 650, 659, 367 P.3d 282 (2016).

Our court applies the same rules in interpreting a municipal ordinance as it does in interpreting a statute. *Robinson v. City of Wichita Employees' Retirement Bd. of Trustees*, 291 Kan. 266, 272, 241 P.3d 15 (2010). The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be ascertained.

*State ex rel. Schmidt*, 303 Kan. at 659. An appellate court must first attempt to determine legislative intent through the statutory language enacted, giving common words their ordinary meanings. *Ullery v. Othick*, 304 Kan. 405, 409, 372 P.3d 1135 (2016). When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. 304 Kan. at 409.

Article 11 of the 1998 Zoning Regulations addressed general procedures for amending the zoning regulations. To obtain a special use permit under Article 11, a property owner was required to submit a proposed special use permit to the planning agency. For its part, the planning agency was required to hold a public hearing and provide notice of the hearing to surrounding landowners. After a public hearing, the special use permit could then be approved by a vote of the Board.

Separate and apart from Article 11, however, a few months later the Board adopted Section 4-116 into the 1998 Zoning Regulations by enacting Resolution 98-13. The intent of Section 4-116 was to "protect all property owners that are operating legal existing businesses located within previously unzoned townships." Section 4-116 applied to townships unzoned before May 7, 1997, but that were later included in the Franklin County zoning regulations. Because the Peoria Township was unzoned prior to May 1997 but was included in the Franklin County zoning regulations on January 8, 1998, Section 4-116 clearly applied to the Quarry.

Section 4-116 allowed the Franklin County Planning Department to issue special use permits to legal existing businesses located in previously unzoned townships. Businesses were allowed to expand the legal bounds of the property, but expansion into additional property acquired after the special use permit was issued required compliance with the application and review process provided in Article 11. Of note, special use permits issued under Section 4-116 were continuous "unless the use is abandoned or

6

vacated for longer than 365 days at which time the Special Use Permit will become null and void."

Peoria Township property owners had 180 days from March 9, 1998, to apply for a special use permit authorized by Section 4-116. To apply for a special use permit under Section 4-116, a property owner was required to file certain documents with the Franklin County Planning Department. The planning department was empowered to review the special use permit application and issue a special use permit to valid existing businesses in the previously unzoned townships. Importantly, unlike Article 11 procedures, Section 4-116 did *not* require notice to surrounding landowners, hearings, or a vote of the Board.

In compliance with Section 4-116, Hunt Midwest applied for a special use permit within 180 days of March 9, 1998. Upon review, the Planning Director approved a special use permit for operations involving the Quarry on July10, 1998. Prior to granting the special use permit, there was no notice to surrounding landowners, no public hearings, no recommendations by the planning agency, and no vote by the Board. As mentioned earlier, no such procedural requirements were required under Section 4-116.

Although Section 4-116 did not require the county to comply with procedural safeguards, a fundamental question was raised by Plaintiffs in the district court and is reprised on appeal:  Did procedural failures or omissions render the Quarry's special use permit invalid under Kansas statutes, in particular, K.S.A. 12-757?

A municipality has no inherent power to enact zoning laws. Instead, a municipality's zoning power is derived solely from the authority granted to the municipality by Kansas zoning statutes. *Crumbaker v. Hunt Midwest Mining, Inc.*, 275 Kan. 872, 884, 69 P.3d 601 (2003). In addition to the zoning statutes in K.S.A. 12-741 et seq., municipalities may enact and enforce additional zoning regulations *which do not conflict* with those statutes. K.S.A. 12-741(a). Our Supreme Court has "long held that the

7

power of a city government to change the zoning of property—which includes issuing special use permits—can only be exercised in conformity with the statute which authorizes the zoning." 275 Kan. at 886.

Under K.S.A. 12-755(a), a county's governing body may adopt zoning regulations that provide for issuing special use permits. But K.S.A. 12-757 demands certain notice and hearing requirements for amending zoning regulations. Importantly, although K.S.A. 12-757 does not explicitly mention special use permits, our Supreme Court has consistently found the procedures in K.S.A. 12-757 apply to special use permits. *Manly v. City of Shawnee*, 287 Kan. 63, 67, 194 P.3d 1 (2008); *Crumbaker*, 275 Kan. at 886.

K.S.A. 1998 Supp. 12-757(b) provides that the planning commission must hold a public hearing on proposed zoning amendments. If the proposed amendment affects specific property, "written notice of such proposed amendment shall be mailed at least 20 days before the hearing . . . to all owners of record of real property located within at least 1,000 feet of the area proposed to be altered." K.S.A. 1998 Supp. 12-757(b). After receiving the planning commission's recommendation, the county's governing body may adopt that recommendation by resolution, override the planning commission's recommendation by a two-thirds majority vote, or return the recommendation to the planning commission. K.S.A. 1998 Supp. 12-757(d). But if the adjoining landowners who were required to be notified file a protest petition, the governing body must approve the amendment by a three-fourths vote. K.S.A. 1998 Supp. 12-757(f).

Upon the adoption of Resolution 98-01, the Quarry was zoned as an Agricultural District (A-3). Any zoning change or special use permit issued after this initial zoning of the Quarry required Franklin County to follow the procedures in K.S.A. 12-757. Yet, it is undisputed that the Quarry's special use permit was granted without a public hearing, notice to the surrounding landowners, or a vote by the Board. As a result, the special use

8

permit application process in Section 4-116 of the 1998 Zoning Regulations did not comply with the mandatory statutory procedures set forth in K.S.A. 12-757.

The procedural defects here resemble those in *Crumbaker*. In *Crumbaker*, the defendant operated a quarry under Johnson County zoning designations with a 10-year conditional use permit. Before the conditional use permit expired, the defendant and the City of DeSoto entered into an annexation agreement. Under this agreement, the City allowed the defendant to continue and expand quarry operations without following the procedures for rezoning and obtaining a special use permit under K.S.A. 12-757. Our Supreme Court held that this procedural failure rendered the City's action invalid. 275 Kan. at 887.

In the case on appeal, Defendants argue that the statutory procedures provided in K.S.A. 12-757 are not applicable to the Quarry's special use permit because the quarry was a nonconforming use. In support of their argument, Defendants rely on *M.S.W., Inc. v. Marion County Bd. of Zoning Appeals*, 29 Kan. App. 2d 139, 24 P.3d 175 (2001).

Kansas law recognizes the nonconforming use doctrine. *Zimmerman v. Board of Wabaunsee County Comm'rs*, 293 Kan. 332, 347, 264 P.3d 989 (2011). A nonconforming use is "a lawful use of land or buildings which existed prior to the enactment of a zoning ordinance and which is allowed to continue despite the fact it does not comply with the newly enacted use restrictions." *Johnson County Memorial Gardens, Inc. v. City of Overland Park*, 239 Kan. 221, 224, 718 P.2d 1302 (1986). Kansas courts have recognized that the nonconforming use doctrine has a policy of restriction and eventual elimination of the nonconforming use. *Board of Seward County Comm'rs v. Navarro*, 35 Kan. App. 2d 744, 752, 133 P.3d 1283 (2006). "If a nonconforming use is established, however, the party has a vested right which is protected by due process." *Crumbaker*, 275 Kan. at 882.

9

The nonconforming use doctrine is codified at K.S.A. 12-758(a), which states that "regulations adopted under authority of this act shall not apply to the existing use of any building or land." Contrary to Defendants' argument, however, the Quarry was not exempt from the requirements of Kansas statutes based on this statutory language. While the *regulations* zoning the area as agricultural land did not apply to the Quarry, Defendants still needed to follow the *statutory* procedures provided in K.S.A. 12-757 to obtain a special use permit for the Quarry property.

Defendants' reliance on *M.S.W.* is not persuasive. In *M.S.W.*, Marion County passed a 1992 resolution that zoned previously unzoned areas of the county and simultaneously granted 116 conditional use permits for existing uses. As part of this resolution, the property at issue was zoned agricultural with a conditional use permit allowing for use as a solid waste landfill. The landfill closed in 1996 and, more than a year later, the plaintiff purchased the property. The Plaintiff's applications for landfill permits, however, were rejected. The Board of Zoning Appeals found that no nonconforming use ever existed and the conditional use permit lapsed because the landfill had been closed for over six months.

The *M.S.W.* court held that the county was not required to follow the procedures in the zoning ordinances for issuing a conditional use permit when the conditional use permit was issued simultaneously with the initial zoning. 29 Kan. App. 2d at 147-55. The court agreed that the conditional use permit had the same effect for the landowner as a landfill zoning classification. 29 Kan. App. 2d at 150. The *M.S.W.* court also noted the "granting of [conditional use permits] *simultaneously* with the initial zoning regulations in order to avoid the creation of nonconforming uses is consistent with the disfavored status of nonconforming uses." (Emphasis added.) 29 Kan. App. 2d at 154.

While in the case on appeal, Section 4-116 similarly sought to eliminate nonconforming uses, the circumstances in *M.S.W.* are different from this case. In *M.S.W.*,

10

the county granted the conditional use permit at the time of the initial zoning. Here, the Quarry was operating as a nonconforming use after the property was zoned agricultural in January 1998. Section 4-116 then provided Killough and Hunt Midwest the opportunity to exchange its nonconforming use status for a special use permit.

By issuing the special use permit, the County granted Killough and Hunt Midwest additional protections and rights they would not have enjoyed as a nonconforming use. For example, the special use permit allowed the current use to expand without restriction, allowed for any structure to be rebuilt, and extended the time the use could be abandoned and then resumed. These additional rights granted through the special use permit required Defendants to abide by the statutory procedures found in K.S.A. 12-757.

Moreover, the parties and court in *M.S.W.* did not consider whether the county's unilateral grant of conditional use permits concurrently with the initial zoning regulations violated K.S.A. 12-757. Instead, the legal arguments in *M.S.W.* focused on whether the simultaneous grant of conditional use permits with the initial zoning regulations violated the nonconforming use doctrine. In *M.S.W.*, the plaintiff's main contention was that the county "converted its vested right of a nonconforming use landfill into a nonvested right of a conditional use of property as a landfill without any due process." 29 Kan. App. 2d at 152. While the plaintiff's argument in *M.S.W.* failed to show that the conditional use permit was void, Plaintiffs' arguments here successfully show that the Quarry's special use permit is invalid.

Although the Quarry's special use permit was issued in compliance with the process outlined in Section 4-116, Defendants may not circumvent Kansas' zoning statutes. The failure to follow the notice and procedure requirements of K.S.A. 12-757 when issuing the special use permit renders the county's action invalid. See *Crumbaker*, 275 Kan. at 887. As a result, the Quarry's special use permit must be invalidated.

11

Because the Quarry's special use permit is invalid, we reverse the district court's grant of summary judgment for Defendants which upheld the validity of the Quarry's special use permit. The case is remanded to the district court with directions to grant summary judgment for Plaintiffs on their claim that the Quarry's special use permit is invalid and to vacate the permit. Given our holding based on the Board's noncompliance with the notice and procedure requirements of K.S.A. 12-757, we decline to consider Plaintiffs' other grounds also challenging the validity of the special use permit.

In addition to raising the issue of the invalidity of the special use permit, however, the Plaintiffs also appealed the district court's finding that the Quarry was in operation prior to and at the time of the adoption of the zoning regulations and the Quarry's legal nonconforming use has not been discontinued or abandoned since that time.

### THE QUARRY'S STATUS AS A NONCONFORMING USE

As part of their motion for summary judgment, Plaintiffs contended that the Quarry was not a legal nonconforming use prior to or after the issuance of the special use permit. Plaintiffs acknowledged that under K.S.A. 12-758, land use which existed prior to the enactment of a zoning ordinance may continue despite the fact it does not comply with newly enacted zoning restrictions. As Plaintiffs described it:  "The non-conforming use is thereby allowed to continue, or '*grandfathered in*' and the landowner is allowed to continue the use even if it is a violation of the zoning modification." But Plaintiffs cited Article 8 of the 1998 Zoning Regulations, which provided that any nonconforming use that is "voluntarily discontinued" for a period of six consecutive calendar months shall not thereafter be resumed.

12

On appeal, Plaintiffs contend that Defendants

"cannot now claim a non-conforming use for a quarry when the evidence is uncontroverted that the non-conforming use has been discontinued and lapsed since no rock sales, rock crushing, mining or blasting had occurred for six (6) months after Peoria Township was zoned, and prior to the issuance of [the special use permit] on July 10, 1998."

A nonconforming use is a use which lawfully existed before the enactment of a zoning ordinance. A nonconforming use is allowed to be maintained after the effective date of the ordinance even though it does not comply with newly enacted use restrictions. The party claiming the nonconforming use has the burden to prove such use exists. *Crumbaker*, 275 Kan. at 881; but see *Kuhl v. Zoning Hearing Bd. of Greene Tp.*, 52 Pa. Commw. 249, 251, 415 A.2d 954 (1980) ("Abandonment is a question of fact which depends upon all the factors present in a case, and the burden of proving an abandonment of a non-conforming use is on those who assert the abandonment.").

Article 8 of the 1998 Zoning Regulations addressed nonconforming uses. Under Section 8-130(I), when a nonconforming use of land is discontinued or abandoned for six consecutive months, the nonconforming use may not be reestablished or resumed, and any subsequent use must conform to the zoning regulations. In granting summary judgment to Defendants, the district court determined that (1) the Quarry operated as a nonconforming use when Peoria Township was zoned, and (2) the nonconforming use was never discontinued or abandoned.

In this case the uncontroverted facts showed no mining, crushing, or blasting of rock occurred at the Quarry from 1994 until 2016. There were no rock sales from October 1997 until November 1998. As a result, no rock sales from the Quarry occurred during the six months after the Peoria Township was zoned. However, the Quarry was leased by

13

Killough each year since 1997 and the district court specifically found that "rock was sold from the Quarry every year since 1997."

The district court specifically applied the law from *Union Quarries, Inc. v. Board of County Commissioners*, 206 Kan. 268, 275, 478 P.2d 181 (1970), which, in the words of the district court, meant that "the legal, non-conforming use existed, continued, and was not abandoned as long as rock from the quarry was sold each year and the quarry use was not otherwise abandoned." In this regard, the district court made two key findings. First,

> "[r]ock sales occurred in October 1997 from the Quarry, which was within a year before the zoning resolution was passed on January 8, 1998, and thus the Quarry was in operation prior to the adoption of the zoning regulations, and was a non-conforming use at the time of the adoption of the zoning regulations."

Second, "the Quarry use has not been discontinued or abandoned since January 8, 1998."

Was the use of the Quarry discontinued or abandoned prior to or after enactment of the 1998 Zoning Regulations? The word discontinuance, as used in a zoning ordinance, is equivalent to abandonment. *Union Quarries*, 206 Kan. at 275. "Abandonment of a nonconforming use ordinarily depends upon a concurrence of two factors: (1) An intention to abandon; and (2) an overt act, or failure to act, which carries the implication the owner does not claim or retain any interest in the right to the nonconforming use." 206 Kan. 268, Syl. ¶ 3. Importantly: "Mere cessation of use does not of itself amount to abandonment although the duration of nonuse may be a factor in determining whether the nonconforming use has been abandoned." 206 Kan. 268, Syl. ¶ 4.

14

While abandoning a nonconforming use typically requires an intent to abandon the use, the 1998 Zoning Regulations eliminate the intent requirement. Section 8-130(I) provides that when a nonconforming use is discontinued or abandoned for six consecutive months "(regardless [of] any reservation of an intent not to abandon or to resume such use), such use shall not thereafter be re-established or resumed."

Our Supreme Court has addressed whether a nonconforming quarry use was abandoned in *Union Quarries*. The quarry operator in *Union Quarries* had removed its quarrying and crushing equipment from the land. Then, for a period of two years, there was no rock drilling, blasting, or crushing on the quarry land. And, similar to the present case, the regulations at issue in *Union Quarries* provided that a nonconforming use that has been abandoned for six months may not be resumed.

Our Supreme Court in *Union Quarries* held that the evidence supported a finding that the nonconforming quarry use was not abandoned. 206 Kan. at 276. The court found that the quarry operator's actions of using portable quarrying equipment as needed to maintain rock stockpiles was in line with common quarrying practices. The court then noted that, during the two years of no blasting, the quarry operator made royalty payments, small quantities of rock were sold, and a salesperson quoted rock prices to construction companies. The court concluded:  "The property was initially purchased for a rock quarry. There was little in the evidence to suggest abandonment—to the contrary, it indicated the property has continually been held for the same purpose." 206 Kan. at 276.

A review of law from other jurisdictions also supports the view that a nonconforming quarry use is not abandoned simply because there is no rock mining, crushing, or blasting. See *Bither v. Baker Rock Crushing Co.*, 249 Or. 640, 649, 438 P.2d 988, modified 440 P.2d 368 (1968). Indeed, courts typically find that a nonconforming quarry use is not abandoned when there is storage and sale of rock. *River Springs, Ltd.*

*Liability Co. v. Board of Teton County Comm'rs*, 899 P.2d 1329, 1335 (Wyo. 1995) (holding that a nonconforming quarry was not abandoned, even though the quarry was substantially dormant for six years, when small quantities of previously quarried limestone were removed). See *Hinkle v. Board of Zoning Adjustment and Appeals of Shelby County.*, 415 S.W.2d 97, 100 (Ky. 1967) (noting that "although the only activities at the quarry were the storage and sale of stone, the quarry was never abandoned").

Two Oregon cases provide additional guidance on whether a nonconforming quarry use has been abandoned. In *Polk County. v. Martin*, 292 Or. 69, 78, 636 P.2d 952 (1981), the court held that a nonconforming quarry use had not been abandoned even though the use was intermittent and fluctuated. In the four years before the quarry in *Martin* was zoned, only 6,000 cubic yards of rock were removed with less than $1,000 of sales. However, this low production and sales were consistent with the quarry's previous 30 years.

The *Martin* court determined that there was no interruption in use either before or after the zoning ordinance became effective. Although the sporadic and intermittent use was relevant to the scope of the permitted nonconforming use, it did not negate the existence of an ongoing quarry business. 292 Or. at 76. The *Martin* court found:

> "The land had been used in the same manner for over 30 years. There was continuous use in the sense that stockpiling existed and the owner had committed the property to that use. Even though the sales were not substantial, rock was available for sale and sales were periodically made. The same is true of the quarrying. There was no interruption of the use . . . ." 292 Or. at 78.

In the other Oregon case, *Tigard Sand and Gravel, Inc. v. Clackamas County*, 149 Or. App. 417, 423-24, 943 P.2d 1106 (1997), the court distinguished *Martin* and found that a nonconforming quarry use had been abandoned for more than 12 consecutive months. After the quarry in *Tigard Sand* was zoned, there was no crushing or quarrying

16

activity from 1984 until 1991. Although there was a rock stockpile on the property, the site did not remain open for sales during the seven-year period. And, from 1989 to 1991, the property was converted into a firewood processing and wood sorting business while the quarry site was not utilized.

In holding that the nonconforming quarry use was abandoned, the *Tigard Sand* court found:

> "In this case . . . petitioner's quarry use was not simply fluctuating, intermittent or sporadic. For a period of seven years, it virtually had stopped, and, for the last two of those seven years, the site on which it had been conducted was used principally, if not exclusively, for a business activity that was totally unrelated to quarry operations. Under the findings, the nonconforming quarry use was both interrupted and abandoned as a matter of law, and the resumption of the use was foreclosed . . . ." 149 Or. App. at 424.

Returning to the present case, both before and after enactment of the 1998 Zoning Regulations, the land was continually under lease to quarry operators, rock was continuously stockpiled at the Quarry, and there were yearly rock sales. The Quarry was created by blasting and quarrying about 30,000 tons of rock. This rock was stockpiled and periodically sold over the next 20 years. The evidence shows that, from at least 1996 to 2000, Hunt Midwest sold rock from the Quarry each year. During this time—both before and after the Peoria Township was zoned—rock sales occurred several months apart and the amount sold per year varied from 3,283 tons in 1996, 662 tons in 1997, 112 tons in 1998, 2,246 tons in 1999, and 1912 tons in 2000. No other use—other than operating and maintaining the Quarry—occurred on the land from the date the Quarry was established until this litigation.

As in *Martin*, the Quarry land had been in use as a quarry for many years. There was continuous use in the sense that stockpiling occurred and the owner had committed to this particular use and no other. Rock was available for sale and sales were periodically

17

transacted at least once per year. There was no interruption in this use of the Quarry. The intermittent sales that occurred after the quarry was zoned resembled its previous use. Even though there were no rock sales in the six months after the Peoria Township was zoned, the quarry was not abandoned.

We decline to adopt Plaintiffs' suggestion that a nonconforming quarry use is invariably abandoned between rock sales. A quarry is a unique business. Although intent to abandon is not relevant to the 1998 Zoning Regulations, courts widely recognize that quarry operations are inherently sporadic and abandonment may not be inferred from the mere fact that blasting or crushing stopped or rock sales fluctuated. As the court in *Tigard Sand* observed: "[Q]uarry uses are generally more likely than some other types of uses to be characterized by variations in activity levels and, when that is so, that their 'continuity' should be gauged accordingly." 149 Or. App. at 423-24.

The Quarry was continuously used as a rock quarry prior to and at the time of the adoption of the zoning regulations. The Quarry was leased by Hunt Midwest and there is no evidence that the land was used for another purpose. Although rock sales were sporadic, rock was stockpiled, available for sale, and sales were periodically made at least once a year. The district court did not err in its legal conclusion that the Quarry has been operating continually and without abandonment as a lawful, nonconforming use since prior to and at the time of the adoption of the zoning regulations.

Although the district court made sufficient findings of fact and legal conclusions favoring Defendants' nonconforming use claim, it did not specifically order summary judgment for Defendants on that basis, undoubtedly because it granted summary judgment for Defendants based on the special use permit claim. Accordingly, on remand, the district court is directed to grant summary judgment for Defendants on the claim that the Quarry was in operation prior to and at the time of the adoption of the zoning

18

regulations and the Quarry's lawful nonconforming use has not been discontinued or abandoned since that time.

Reversed and remanded with directions.